IN IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

EMILY GRANT DECARLO,
ADMINISTRATRIX OF THE
ESTATE OF ANGEL DECARLO,
     Plaintiff,

     v.                                    Civil No. 3:23cv664 (DJN)

DETECTIVE CAMERON LIST,
*In his individual capacity,*
     Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Detective Cameron List's ("Defendant") Motion for Summary Judgment, (ECF No. 22 ("Def. Mot.")). The Estate of Angel DeCarlo ("Plaintiff") filed its Memorandum in Opposition, (ECF No. 27 ("Pl. Mot. Oppo.")) and Defendant filed his Reply, (ECF No. 29), rendering the matter ripe for review. For the reasons that follow, the Court will GRANT Defendant's Motion for Summary Judgment as to each count in the Complaint and each Count will be DISMISSED WITH PREJUDICE.

## I. BACKGROUND

The Court endeavors to construe the facts in the light most favorable to Plaintiffs as the non-moving party, including consideration of those facts that appear to stand to dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Viewing the evidence through such a lens, the following narrative constitutes the facts for purposes of resolving Defendant's Motion for Summary Judgment.

On December 18, 2018, Hopewell City dispatch received a 911 call[1] from an individual

---

[1]    The 911 call is part of the record as Exhibit A to the Defendant's Motion for Summary Judgment.

who had been robbed by a woman with a gun. (Def. Mot. at 3.)  The victim reported that he was driving a vehicle and that the woman — an African-American female wearing a black jacket — who had robbed him was now chasing him while wielding "either a 9mm or 20mm" handgun. (*Id.*); (Def Mot. Exh. A 00:35–1:00, 1:30–1:42).  Accordingly, the 911 call operator requested assistance from any units in the area that could head to the location of the robbery. (Def. Mot. at 3.)  One of the individuals who heard this call for assistance was Defendant Detective Cameron List.  Authorities later determined that the suspect in-question was Angel DeCarlo ("DeCarlo"), whose estate constitutes the Plaintiff in this matter.

Upon hearing the request for assistance, Defendant, alongside another detective, left the Hopewell Police Department ("HPD") headquarters in an unmarked police vehicle equipped with emergency lights to respond to the scene. (*Id.* at 4.)  During the ride, both detectives heard several officers confirm over the radio that DeCarlo was publicly wielding a firearm, and one officer related that she had pointed her gun at him. (*Id.*); (Def Mot. Exh. C at 20:4–12 ("List Depo.")).  After hearing this information, Defendant and his fellow detective began to plan what they would do once they arrived at the scene; Defendant later stated that he thought that they could tackle DeCarlo if they could get close enough. (Def. Mot. at 4); (List Depo. at 18:10–20.)

Upon arriving at the scene, with his body camera footage on and fully functioning,[2] Defendant witnessed DeCarlo eluding a marked police vehicle that had its lights and sirens activated while she wielded a firearm in one hand. (*Id.*); (Def Mot. Exh. D at 00:20–00:30 ("Body Cam Footage")).  Accordingly, Defendant activated the lights of the unmarked police car

---

[2]     Defendant's body cam footage is part of the record as Exhibit D to the Defendant's Motion for Summary Judgment.  A slow-motion version of the footage is part of the record as Exhibit E to the same.

that he arrived in and exited his vehicle while wearing a black vest that read "POLICE" in white lettering. (Def. Mot. at 4.) Upon exiting his vehicle, Defendant immediately drew his firearm and pointed it at DeCarlo while commanding her in a loud voice to "stop" at least four times. (*Id.* at 5.); (Body Cam Footage at 00:32–00:36).

DeCarlo did not comply with Defendant's directives. Rather, she continued to walk across the street while holding her firearm in one hand. (*Id.*) After a few seconds of ignoring Defendant's orders to stop, DeCarlo turned toward Defendant and raised her gun in his direction. (Def. Mot. at 5); (Body Cam Footage at 00:36–00:38). At this point, Defendant fired a single shot, striking DeCarlo. (*Id.*) This singular shot would prove fatal, as it entered DeCarlo's torso and passed through the posterior wall of her heart. (Def Mot. Exh. G.)[3]

Seconds after Defendant fatally shot DeCarlo, an officer radioed for a medic. (Def. Mot. at 6); (Body Cam Footage at 00:44–00:48). Defendant then attempted to approach DeCarlo — who was now nonresponsive and laying in the road — but another detective on scene told Defendant to "get back" in order to provide space to the officers responding to DeCarlo. (Def. Mot. at 6); (Body Cam Footage at 00:48–00:50). Defendant did so. Upon informing another responding officer that he was the one who had shot DeCarlo, Defendant was again told to stay away from her. (Body Cam Footage at 1:29–1:34.) Officers continued radioing for a medic and for all units to respond, (*Id.* at 00:50–1:15), and emergency medical services arrived roughly six minutes after DeCarlo was shot, (*Id.* at 6:14–6:16 (showing a fire truck arriving at the scene)). Upon arrival, emergency medical services pronounced DeCarlo deceased. (Def. Mot. at 6.)

Plaintiff now brings several claims pursuant to 42 U.S.C. § 1983 and Virginia common

---

[3]      An autopsy of Angel DeCarlo is part of the record as Exhibit G.

law seeking damages for this series of events.[4]  In Counts I, II and III, Plaintiff brings claims

alleging violations of DeCarlo's Fourth and Fourteenth Amendment rights to be free from

unreasonable searches and seizures, excessive force, and for being denied prompt medical care

after the shooting occurred.  (Compl. at 11–14.)  In Counts IV, V and VI, Plaintiff brings claims

under Virginia common law for false imprisonment, battery and gross negligence.  (*Id.* at 14–

17.)  For relief, she moves the Court for compensatory damages in excess of $25,000,000, to

include both survival damages and wrongful death damages; funeral and burial expenses;

damages for loss of financial support; punitive damages in the amount of $350,000; interest

accruing from December 18, 2018; reasonable attorneys' fees; and any other relief that the Court

may deem just and proper.  (*Id.* at 17–18.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The relevant inquiry at the summary judgment stage analyzes "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law."  *Liberty Lobby, Inc.*, 477 U.S. at 251–

52.  When reviewing a motion for summary judgment, the Court views the facts in the light most

favorable to the nonmoving party.  *Id.* at 255.  The Court cannot weigh the evidence; it must

simply determine whether a genuine issue exists for trial.  *Greater Balt. Ctr. For Pregnancy*

*Concerns v. Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (quoting *Liberty Lobby, Inc.*, 477 U.S.

at 249).  However, when the facts at issue are captured by a video recording, the Court "views

---

[4]      Plaintiff dismissed with prejudice her official capacity claims against Defendant.  (ECF
No. 8.)

the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

Once the movant properly makes and supports a motion for summary judgment, the burden shifts to the opposing party to show that a genuine dispute of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the standard requires "that there be no *genuine* issue of *material* fact." *Liberty Lobby, Inc.*, 477 U.S. at 247. A genuine issue of material fact arises only when the evidence, viewed in the light most favorable to the nonmoving party, sufficiently allows a reasonable jury to return a verdict in that party's favor. *Id.* at 248. To defeat an otherwise properly supported motion for summary judgment, the non-moving party must rely on more than conclusory allegations or the "mere existence of a scintilla of evidence." *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted).

### III. DISCUSSION

In order to clarify the disputed facts of this case, the Court begins by addressing Plaintiff's failure to comply with Local Rule 56(B), which requires a brief in opposition to a summary judgment motion to "specifically caption . . . all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Loc. R. 56(B). The Court then turns to addressing Plaintiff's constitutional claims, reflected by Counts I, II and III, and then reviews Plaintiff's common law claims, represented by Counts IV, V and VI. For the reasons that follow, the Court concludes that, even when viewing any disputed evidence in the light most favorable to Plaintiff alongside the undisputed facts at-issue in this case, that no Count

should be presented to a jury, because each Count fails as a matter of law.

## A. Plaintiff's Failure to Comply with the Local Rules

Plaintiff's brief in opposition, (ECF No. 27), fails to comply with the local rules. As noted, Local Rule 56(B) requires parties litigating summary judgment to provide the Court with a list of all material facts to which a genuine issue of dispute exits, with record cites as appropriate. The logic of this rule is self-evident. As courts in this District have stated:

> "[Local Rule 56(B)] serves two salutary purposes. It notifies non-moving parties of the facts that the movant contends are undisputed and support the movant's alleged entitlement to judgment as a matter of law, and it provides the Court with an organized analytical framework to assess whether any material factual dispute exists and whether the movant is entitled to the relief sought."

*CertusView Techs., LLC v. S&N Locating Servs., LLC*, 2015 WL 4717256, at *5 (E.D. Va. Aug. 7, 2015). A party's "compliance with Local Rule 56(B) is critical for a court — and opposing parties — to assess the merits" of a given summary judgment motion, which highlights its importance to the efficient and fair administration of justice. *Id.*

The critical role that Local Rule 56(B) plays explains why the remedy for failing to comply with it bears a harsh edge. If a party fails to comply with the Rule, then "the Court may assume that facts identified by the moving party in its listing of material facts are admitted." Thus, the Court may assume that each and every undisputed fact listed by Defendant is indeed undisputed for the purposes of adjudicating his motion for summary judgment. For instance, crucial facts, such as whether DeCarlo "pointed her firearm at [Defendant] for two to three seconds," (Def. Mot. at 5, ¶ 11), may be considered as admissions. Despite Plaintiff's failure, the Court does not deem any material fact as conceded and undertakes a scrutinizing assessment of the material facts in this case to determine whether there exists a dispute that ought be heard before a jury.

## B. Defendant is Entitled to Qualified Immunity on Counts I, II and III

Plaintiff brings three claims under 42 U.S.C. § 1983 alleging that Defendant violated DeCarlo's Fourth and Fourteenth Amendment rights. As such, Plaintiff must overcome the defense of qualified immunity, which protects Defendant — an official acting under color of law — provided that he did not violate Plaintiff's clearly established constitutional right. *Ray v. Roane*, 948 F.2d 222, 229 (4th Cir. 2020). As set forth below, the Court finds that Defendant did not violate Plaintiff's constitutional rights, and therefore stands protected by qualified immunity against the claims forwarded by Plaintiff in Counts I, II and III. As such, the claims in these counts fail as a matter of law, and the Court will thus GRANT summary judgment in Defendant's favor as to each of those counts.

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Wingate v. Fulford*, 987 F.3d 299, 311 (4th Cir. 2021). In doing so, it "'gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Barrett v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 429 (4th Cir. 2020) (quoting *Stanton v. Sims*, 571 U.S. 3, 5 (2013)). As the party asserting the defense of qualified immunity, Defendant bears the burden of establishing its propriety here. *Wingate*, 987 F.3d at 311.

The Supreme Court has determined that state actors like Defendant are protected by qualified immunity "unless (1) [the government actor] violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). Determining which prong of the qualified immunity analysis to first review rests within the Court's discretion. *Pearson v.*

7

*Callahan*, 555 U.S. 223, 236 (2009).  To determine whether a right is clearly established, a court must:

> first look to cases from the Supreme Court, this Court, or the highest court of the state in which the action arose.  In the absence of directly on-point, binding authority, courts may also consider whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority.  The Supreme Court has ruled against defining a right at too high a level of generality and held that doing so fails to provide fair warning to officers that their conduct is unlawful outside an obvious case.

*Roane*, 948 F.2d at 229.  Thus, there must be a high degree of specificity between the on-point sources that show a right is clearly established and the constitution-violating conduct.  *Marshall v. Marshall*, 523 F.Supp.3d 802, 821 (E.D. Va. 2021).  "If the law did not put the officer on notice that his conduct would be clearly unlawful . . . qualified immunity is appropriate."  *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

### 1. Count I – Unreasonable Search and Seizure

In Count I, Plaintiff alleges that Defendant violated DeCarlo's Fourth Amendment right to be free from unreasonable searches and seizures, because he "attempted to detain Ms. DeCarlo without reasonable suspicion and attempted to arrest her without probable cause."  (Compl. ¶ 90.)  In other words, Plaintiff claims two separate violations of DeCarlo's Fourth Amendment rights — first, Defendant violated her constitutional rights by attempting to seize her without reasonable suspicion and second, when he in-fact seized her — by shooting her — without probable cause.  *See Torres v. Madrid*, 592 U.S. 306, 318 (2021) (holding that a seizure occurs the instant that someone is shot). In response, Defendant first suggests that no constitutional right was implicated until he shot Plaintiff, because she did not acquiesce to his show of force.  (Def. Mot. at 8.); *see United States v. Stoyer*, 808 F.3d 991, 996 (4th Cir. 2015) ("[W]ithout actual submission to the police, there is at most an attempted seizure, which is not subject to Fourth

8

Amendment protection."). Second, he contends that the information related to him about DeCarlo's conduct meets the standard for probable cause and, therefore, that Defendant's eventual seizure of DeCarlo did not abridge her constitutional rights. (Def. Mot. at 8.)

The Court finds that the Fourth Amendment did not become relevant here until Defendant discharged his firearm, striking DeCarlo. This is so, because when there is a non-consensual interaction between a member of the public and a state actor, the Fourth Amendment affords its protections only when the person that is the "subject of the seizure actually acquiesced to that authority." *Stover*, 808 F.3d at 995 (citing *California v. Hodari D.*, 499 U.S. 621, 628–629 (1991)). Here, the interaction was self-evidently not consensual, as DeCarlo "would not have felt free to terminate [the interaction]," given that a police officer and multiple detectives had surrounded her, turned on their police lights, activated their sirens and had a gun drawn on her. *Stover*, 808 F.3d at 995. However, before the Fourth Amendment applies, there must also be a submission to authority. *Id.* at 996. Whether submission occurred is a fact-intensive inquiry, and what "amounts to submission depends on what a person was doing before the show of authority." *Brendlin v. California*, 551 U.S. 249, 262 (2007). In this case, before Defendant interacted with DeCarlo, she was fleeing the police and walking around the area where she had just committed an armed robbery. Furthermore, upon Defendant's arrival, she continued walking around, making no apparent change in her conduct in response to Defendant's show of authority. As such, no submission occurred that would trigger the Fourth Amendment prior to Defendant shooting DeCarlo.

Yet, even if a seizure did occur when Defendant arrived on the scene, probable cause existed at that time. To determine whether probable cause existed, the Court must consider the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). Specifically, the Court

9

must consider two factors: "the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019). If "the facts known to the officer could make a prudent officer believe that the suspect's conduct satisfies the elements of a criminal violation," then probable cause exists. *Thurston v. Frye*, 99 F.4th 665, 674 (4th Cir. 2024).

Here, Defendant suspected DeCarlo of having committed crimes, including armed robbery, as a victim reported to 911 that an African-American woman matching her description had robbed him at gunpoint in the area where she was found, (Def Mot. Exh. A), and assaulting a police officer, since at least one officer reported that DeCarlo had pointed her gun at them, (Def Mot. Exh. B at 00:30–00:32). Plaintiff does not provide the Court with any reason that Defendant should not have believed the accuracy of these sources. Indeed, DeCarlo's conduct when Defendant arrived at the scene — walking aimlessly across the road while holding a gun and refusing to acknowledge any officer's commands — only further establishes that it would be objectively reasonable for Defendant to accept those sources' information as true. Thus, upon arriving at the scene, Defendant possessed the objectively reasonable belief that DeCarlo had robbed someone at gunpoint and pointed a gun at a police officer.

This conduct is clearly proscribed by Virginia statute. Assault is an intentional act that makes a person believe that they will be intentionally harmed and, when perpetrated upon a police officer, constitutes a felony. *Davis v. United* States, 430 F.Supp.3d 141, 145 (E.D. Va. 2019); Va. Code § 18.2-57. Defendant reasonably believed that DeCarlo had assaulted a police officer after being informed by an officer that DeCarlo had done so, which was corroborated by DeCarlo's behavior upon Defendant's arrival. Armed robbery is also, obviously, proscribed in the Commonwealth of Virginia. A Class 5 felony armed robbery occurs when a person commits

10

a robbery using physical force, even if it does not result in bodily injury. Va. Code § 18.2-58(B)(3).

Here too, Defendant possessed the objectively reasonable belief that DeCarlo had engaged in this conduct, because multiple different sources related as much. Thus, when considering what Defendant knew about DeCarlo's conduct and the contours of the conduct proscribed by Virginia law, the Court concludes that a "prudent officer [would] believe that [DeCarlo's] conduct satisfie[d] the elements of" at least one of these felonies, if not both, even when drawing the facts in the light most favorable to Plaintiff's case. *Thurston v. Frye*, 99 F.4th 665, 674 (4th Cir. 2024). As such, probable cause existed to support Defendant's seizure of DeCarlo, even if that seizure occurred within seconds of Defendant arriving at the scene. From this flows the inevitable conclusion that Defendant did not violate DeCarlo's Fourth Amendment rights as described by Count I, and he therefore stands protected by qualified immunity from Plaintiff's claim under § 1983.

### 2. Count II – Excessive Force

Count II represents Plaintiff's claim that, by virtue of the deadly force used against DeCarlo, she was denied her Fourth Amendment right to be free from unreasonable seizures, such as those conducted with excessive force. (Compl. at 12–13.) Specifically, Plaintiff contends that, because Defendant could have warned DeCarlo that he was going to use deadly force, but did not, and due to DeCarlo not walking toward Defendant when he fired the fatal shot, that the shooting was excessive and unreasonable. (*Id.*)

The Fourth Amendment's objective reasonableness standard governs Plaintiff's claim that Defendant's imposition of deadly force was excessive. *Graham v. Connor*, 490 U.S. 386, 395 (1989). A police officer may use deadly force "when the officer has sound reason to believe

that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996). To determine whether an officer like Defendant had a "sound reason" to warrant the use of deadly force, the Court must determine whether using deadly force was "objectively reasonable in light of the facts and circumstances confronting [him], viewed in the light most favorable to [Plaintiff], without regard to [Defendant's] underlying intent or motivation." *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir. 2022). Only the information possessed by Defendant at the time of the shooting may inform the excessive force analysis. *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005).

Plaintiff lingers on the fact that Defendant provided no warning to DeCarlo that he would use deadly force before deploying such force. (Compl. at 12.) Even if the Court were to construe Defendant's repeated admonition to DeCarlo to "stop" before he shot her as failing to qualify as a warning, it would not defeat Defendant's claim for qualified immunity. While it is true that an officer should give a warning before using deadly force, it is only held against the officer when it is feasible to issue one, but they still fail to do so. *Garner*, 471 U.S. at 11–12. But as is the case here, where a "a warning might easily have cost the officer his life," issuing a warning is not considered feasible, and the failure to issue one, thus, cannot be held against Defendant in this analysis. *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994).

Even when drawing the facts in Plaintiff's favor, DeCarlo was the suspect of an armed robbery and was wielding a gun that she pointed directly at Defendant while eluding the police. Given these facts, Defendant's use of deadly force in the absence of a specific warning that deadly force was imminent qualifies as reasonable. *See Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996) (holding that an officer's use of deadly force was reasonable when a handcuffed suspect pointed a small handgun at him and the officer ordered the suspect to drop his weapon, a

direction that the suspect ignored); *Rambert v. City of Greenville*, 2024 WL 3382376, at *6 (4th

Cir. 2024) (finding that noncompliance with commands while demonstrating indicia of

dangerousness militates toward deadly force being objectively reasonable).

Plaintiff also suggests that Defendant's use of force was categorically unreasonable,

given that Defendant failed to consider that DeCarlo allegedly "exhibited signs of being under

physical and mental duress" before deploying deadly force. (Compl. ¶¶ 6, 21, 31, 53, 56, 67.) In

other words, Plaintiff puts forth that DeCarlo was experiencing a mental health crisis, and,

because of this, Defendant's imposition of deadly force qualified as objectively unreasonable.

This argument fails to render Defendant's use of deadly force unreasonable for two reasons.

First, Plaintiff has provided no evidence demonstrating that DeCarlo was indeed having a mental

health episode and that, if it were true, Defendant should have known that DeCarlo was in the

throes of a mental health crisis.[5] (Mot. Opp. at 21.)  Second, even if DeCarlo were in mental

distress and Defendant recognized as much, this finding would not change the reasonability of

Defendant's use of deadly force.  DeCarlo was still the suspect of a violent crime who was

openly wielding a gun in a manner that threatened both Defendant and nearby members of the

public, while at the same time consistently refusing to adhere to officers' commands.  These

facts, which are uncontroverted and supported by video evidence and 911 call logs, demonstrate

the imminency of the threat that DeCarlo posed and, so too, the reasonability of Defendant's use

of deadly force. *See Rambert*, 2024 WL 3382376, at *7 (holding that even if the victim was

experiencing a mental health episode, deadly use of force was reasonable, because the victim

---

[5]     As noted above, *supra* Part A, Plaintiff's failure to comply with the Local Rules deems
the existence of Plaintiff's mental health crisis as conceded in Defendant's favor.  So too with
respect to whether Defendant in-fact knew that DeCarlo was undergoing a mental health crisis.
But even if these facts were disputed, and thus construed in Plaintiff's favor, it would not change
the Court's ultimate conclusion.

posed an immediate threat to the responding officer).

The Court now moves to discussing the three factors that govern the excessive force

analysis: (1) "the severity of the crime"; (2) "whether the suspect posed an immediate threat to

the safety of the officers or others"; and (3) "whether [the suspect] [was] actively resisting arrest

or attempting to evade arrest." *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir. 2022) (citing

*Graham*, 490 U.S. at 396). The severity of the crime, as understood by Defendant when he

responded, was extremely severe, as DeCarlo was the suspect of an armed robbery, a felony

offense. *Cf. Knibbs*, 30 F.4th at 215 (finding that misdemeanor offense was not a severe crime

for purposes of this analysis); *Lee v. Bevington*, 647 F. App'x 275, 283 (4th Cir. 2016) (when a

violent crime undergirds the shooting, it weighs toward finding that deadly force qualified as

reasonable). The second factor likewise weighs against Plaintiff, because DeCarlo posed an

immediate threat to herself, the officer and all those nearby, as she was openly brandished a gun

— having just committed an armed robbery — and then pointed it at Defendant, and even yelled

"no" when a responding officer asked her to drop her weapon. (Pl. Mot. Oppo. at 3.); *accord

Anderson v. Russell*, 247 F.3d 125, 132 (4th Cir. 2001) (finding it reasonable to use deadly force

when the officer reasonably believed that the victim posed a deadly threat to himself and others);

*Aleman v. City of Charlotte*, 80 F.4th 264, 286 (4th Cir. 2023) (noting that there are "many"

circumstances in which "a police officer could reasonably feel threatened, such that the use of

deadly force would be permissible," including "when a firearm-brandishing suspect 'point[s] [or]

aim[s] . . . his weapon [at the officer]'"). The final factor also cuts against Plaintiff. Even

though there were multiple cars with police lights flashing, one marked cruiser with its sirens on,

and at least one officer commanding her to stop, DeCarlo continued to elude the police. *Cf.

Knibbs*, 30 F.4th at 216 (finding this factor weighed in the plaintiff's favor when the officer was

14

not trying to arrest the victim at the time of the shooting).

Taking these factors together, each strongly weigh against finding that Defendant deployed excessive force when he shot DeCarlo. He was responding to a violent felony and, upon arrival, DeCarlo pointed a gun at him while simultaneously evading the police. "No court" — including this one — "can expect any human being to remain passive in the face of an active threat on his or her life." *Waterman v. Batton*, 393 F.3d 471, 541 (4th Cir. 2005). While Plaintiff resists this conclusion, she provides virtually no analysis of these factors, and their respective weight on the facts of this case.[6] (Pl. Mot. Oppo. at 6–7.) As such, "[Defendant's] use of deadly force in response to an obvious, serious and immediate threat to his safety is not excessive." *Rambert*, 2024 WL 3382376, at *7. Even accepting the merit of Plaintiff's suggestion that Defendant could have attempted to de-escalate, could have used non-lethal force or otherwise conducted himself differently, "[t]h[e] suggestion that the officer[] might have responded differently is exactly the type of judicial second look that the case law prohibits." *Elliott*, 99 F.3d at 643. Accordingly, Defendant did not use excessive force when he shot and killed DeCarlo, and therefore did not violate her constitutional right to be free from such force. Qualified immunity thus insulates him from the claims forwarded in Count II. *Accord Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001) (concluding that officer did not use excessive force when he shot an unarmed individual, because he reasonably perceived that the victim was reaching toward a gun in his pocket).

---

[6]     Plaintiff also relies on a Virginia statute governing an officer's use of deadly force that did not exist at the time during which the facts of this case occurred, which prohibits the Court from considering it here, given that Plaintiff fails to offer any explanation as to why it should be applied or considered retroactively. *See Landgraf v. USI Film Products*, 511 U.S. 244, 272 (1994) (describing the presumption against retroactivity).

### 3. Count III – Denial of Medical Care

At the outset, the Court recognizes that Plaintiff completely omitted briefing this issue in her Motion in Opposition, (ECF No. 27), which constitutes a second reason that the Court may consider every fact articulated by Defendant in his brief as undisputed.[7] Thus, the undisputed facts relevant to this Count are as follows.

Defendant arrived at the scene and immediately came into contact with Angel DeCarlo, who was holding a gun. (Ex. D. at 00:35–00:41.) Defendant then ordered DeCarlo to "stop," and when she turned toward him, he fired a single shot into her chest cavity. (*Id.*) DeCarlo managed to walk a few steps after being shot, and then fell to the ground where she began to bleed profusely. (*Id.*) Within seconds of DeCarlo falling, an officer radioed for a "medic," and when Defendant attempted to approach her, he was directed to "get back" by an officer. (*Id.* at 00:42–00:45.) Around fifteen seconds later, an officer radioed for medics a second time. (*Id.* at 00:49–1:04.) As Defendant stayed back from the scene, as directed, several more officers began responding to DeCarlo and, within seven minutes, emergency medical services arrived. (*Id.* at 00:52–1:33, 6:14–6:16.) Even when taking any potential disputes in Plaintiff's favor (despite Plaintiff's failure to articulate them in her brief), the Court concludes that Angel DeCarlo's constitutional right to medical care was not violated by the events surrounding her death.

Before beginning its substantive analysis, the Court must also note that it construes Plaintiff's Fourth Amendment claim in this count as one brought under the Constitution's

---

[7]     As noted *supra*, Plaintiff failed to comply with Local Rule 56(B).  In addition, Rules 56(e)(2–3) of the Federal Rules of Civil Procedure permits the Court to "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it" when the nonmovant fails to support an assertion or address another party's assertion of fact.

Fourteenth Amendment, because only that amendment gives rise to claims made by arrestees based on the denial of medical care in the Fourth Circuit. *See Basilica v. Harris*, 658 F. Supp. 3d 286, 294–295 (E.D. Va. 2023) ("courts tend to consider an arrestee's medical needs in the context of the Eighth or Fourteenth Amendments and the deliberate indifference standard, rather than the Fourth Amendment."); *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (arrestee denial of medical claim governed by Fourteenth Amendment). Accordingly, the Court — in keeping with the Fourth Circuit — applies the deliberate indifference standard relevant to Fourteenth Amendment claims that seek damages for the denial of medical care.

To state a claim for denial of medical care, Plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). This requires proof that the medical need qualifies as objectively serious and that Defendant acted with objective indifference in failing to respond to the serious medical need. *White v. Thompson*, 639 F.Supp.3d 613, 623 (S.D. W. Va. 2022). Because Defendant concedes DeCarlo having been shot was "objectively serious," the Court need only consider whether his conduct in the immediate aftermath of delivering that injury constitutes deliberate indifference for purposes of the Fourteenth Amendment. (Def. Mot. at 15.)

In this context, deliberate indifference requires that Plaintiff show that Defendant possessed "actual knowledge of [DeCarlo's] serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). Importantly, the Fourth Circuit has recently clarified that this is an objective test, having jettisoned the subjective test that previously governed. *Id.* Thus, it is sufficient for a plaintiff to show that a defendant's action or inaction was "objectively unreasonable" in light of the facts and circumstances they confronted. *Id.* Generally, where

17

medical services are summoned in a manner appropriate to the seriousness of the injury, and when an officer responds to objectively serious harms pursuant to protocol, claims for deliberate indifference fail. *See White*, 639 F.Supp.3d at 623 (deliberate indifference not satisfied when officers requested emergency medical services the same day that arrestee claimed she had "shoulder pain"); *Cf. Short*, 87 F.4th at 613 (concluding that failure to follow a prison's suicide risk protocol satisfies deliberate indifference).

Here, the undisputed facts would not permit any reasonable jury to conclude that Defendant disregarded the risk that his action or inaction would result in harm. To be sure, Defendant did not himself personally call for a medic; however, another officer did — twice — within twenty seconds of Defendant firing the shot. Indeed, Plaintiff fails to properly allege, let alone demonstrate, that Defendant violated protocol for responding to shooting victims, underscoring that Defendant's decision to follow the directions of the officers around him, who directed him to back away from DeCarlo, was entirely reasonable. Defendant's conduct rises nowhere close to the level required to constitute deliberate indifference and thus did not violate DeCarlo's constitutional rights, rendering him protected by qualified immunity for the claims presented by Count III.

### C. Plaintiff's Common Law Claims Fail as a Matter of Law

In Counts IV, V and VI, Plaintiff brings common law claims under Virginia law. Count IV constitutes a claim for false imprisonment, Count V pleads a claim of battery and Count VI posits that Defendant was grossly negligent in shooting and killing Angel DeCarlo. (Compl. at 14–17.) For the reasons that follow, the Court concludes that, when construing every fact in the light most favorable to Plaintiff's case, and considering each undisputed fact, no reasonable jury could conclude that Defendant committed battery, false imprisonment or gross negligence. As

18

such, Plaintiff's claims are not viable as a matter of law, and summary judgment will be GRANTED as to the claims levied in Counts IV, V and VI.

### 1. Counts IV – False Imprisonment

"The tort of false imprisonment is defined in Virginia as restraint of one's liberty without any sufficient legal excuse therefor by word or acts which he fears to disregard, and neither malice, ill will, nor the slightest wrongful intentions is necessary to constitute the offense." *Spiers v. Sydnor*, 3 F. App'x 176, 179 (4th Cir. 2001) (quotations omitted). "However, in no case may a person prevail on a claim of false imprisonment if her arrest was lawful." *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 114 (2021). Here, then, Plaintiff's claim for false imprisonment fails as a matter of law if Defendant had probable cause to stop her.

As the Court addressed *supra*, in Part III.A.1, an analysis which it incorporates here, the stop at-issue here was supported by probable cause. And, as with Part III.A.1, Plaintiff completely omits analysis pertinent to this issue in her briefing. To the extent that the Court can divine Plaintiff's argument, she mistakenly focuses on Defendant's conduct before his encounter with DeCarlo, rather than on whether DeCarlo's pre-encounter conduct as understood by Defendant provided him with probable cause to effectuate her arrest. (Pl. Mot. Oppo. at 6–7.)

To review, the Court found that probable cause existed, because "the facts known to [Defendant] could make a prudent officer believe that [DeCarlo's] conduct satisfied the elements of a criminal violation." *Thurston*, 99 F.4th at 674. Some relevant, undisputed, facts include Defendant's belief that DeCarlo committed an armed robbery immediately before he encountered her, (Exh. A), DeCarlo's refusal to assent to officer commands despite being followed by police vehicles with lights flashing and sirens on, (Body Cam Footage at 00:21–00:29), and that DeCarlo pointed her weapon at an officer, (Exh. B at 00:30–00:32). Based on

these facts, a prudent officer, like Defendant, could reasonably believe that DeCarlo had

committed armed robbery and had assaulted a police officer, both of which constitute felonies in

Virginia, which means Defendant had probable cause to effectuate DeCarlo's arrest.  Va. Code

§§ 18.2-57–58.  Indeed, no reasonable jury could conclude otherwise.

### 2.  Count V – Battery

In Virginia, battery is an unwanted touching that is neither consented, excused nor

justified.  *Koffman v. Garnett*, 265 Va. 12, 16 (2003).  Given that the shooting was self-

evidently not consented to, Defendant must show that the alleged battery was unsupported by a

legal justification or excuse, such as the use of "reasonable force" by an officer "execut[ing] their

lawful duties."  *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009).  Plaintiff argues that

Defendant's conduct was unreasonable, because it violated Virginia Code § 19.2-83.5, which

outlines when officers may use deadly force.  (Pl. Mot. Oppo. at 7, 9.)  However, Defendant's

conduct occurred in 2018, and the referenced statute was not passed until 2021.  *Muhammad v.

Commonwealth*, 2024 WL 2925553, at *10 n.10 (Va. Ct. App. June 11, 2024).  As such, given

that Plaintiff has proffered no argument as to why the statute should be applied retroactively, it

cannot govern this case, and the Court must consider Plaintiff's claims only with respect to the

law governing Defendant's conduct at the time it occurred.  *See Landgraf*, 511 U.S. 244, 272

(1994) (describing the presumption against retroactivity).  And, at the time DeCarlo was killed,

the justification for deadly force in the context of a battery claim brought under Virginia law

paralleled the objective reasonableness analysis used in the Fourth Amendment context.

*Southworth v. Jones*, 529 F.Supp.3d 454, 465 (E.D. Va. 2021).  Thus, the objectively reasonable

analysis under the Fourth Amendment and the justification for deadly force related to a state law

battery claim are coextensive and consequently rise and fall together.  *See Craven v. Novelli*,

20

2024 WL 1952590, at *12 (dismissing battery claim, "inasmuch as they fail where no constitutional violation occurred," because North Carolina law and federal law were coextensive).

Thus, the Court incorporates the analysis that it conducted *supra*, in Part III.A.2, where it concluded that Defendant's use of deadly force was objectively reasonable under the Fourth Amendment. There, the Court noted that the crime that Defendant responded to — an armed robbery and an assault on a police officer— constitute felonies in Virginia, rendering them both severe, violent crimes. *See Lee v. Bevington*, 647 F. App'x at 283 (when deadly force is imposed after responding to a violent crime, it weighs toward finding the use of deadly as objectively reasonable). Moreover, DeCarlo posed an immediate risk both to herself and to the public, as she was wantonly wielding a gun — having just used it to rob a convenience store — and refused to consent to any officers' commands. That she did so in a public street during the middle of the day with members of the public nearby underscores the danger that she posed, which is capped off by the fact that she pointed her gun in Defendant's direction after being commanded to "stop" multiple times. *Anderson*, 247 F.3d at 132 (finding it reasonable to use deadly force when the officer reasonably believed that the victim posed a deadly threat to himself and others). And, that this all occurred while DeCarlo actively eluded the police constitutes yet another reason supporting the Court's finding that Defendant's use of deadly force was objectively reasonable under the facts and circumstances presented to him. *Knibbs*, 30 F.4th at 214 (noting that if the victim was evading arrest at the time deadly force was used, it is more likely that the use of deadly force was reasonable).

As the Court previously articulated, the combination of these factors renders Defendant's use of deadly force as satisfactory under the Fourth Amendment's objective reasonableness

21

standard and no reasonable jury could conclude otherwise.  Because Virginia law at the time of

DeCarlo's death required that battery claims be analyzed in the same fashion as the Fourth

Amendment's objective reasonableness analysis, Plaintiff's claim for battery under Virginia law

fails as a matter of law.  *See Warner v. Centra Health Inc.*, 503 F.Supp.3d 479, 497 (W.D. Va.

2020) ("When a battery is based on the use of deadly force by a SCOP or police officer, the

inquiry mirrors the objective reasonableness inquiry in the Fourth Amendment context.");

*Sigman v. Town of Chapel Hill*, 161 F.3d 782, 789 (4th Cir. 1998) (when an officer's actions are

"reasonable in the circumstances of [the] case, they cannot be negligent or wrongful").

### 3.  Count VI – Gross Negligence

Plaintiff's final claim against Defendant is for gross negligence under Virginia law.

Gross negligence resembles "action which shows indifference to others, disregarding prudence to

the level that the safety of others is completely neglected.  [Such] negligence . . . shocks fair

minded people but is less than willful recklessness." *Harris*, 253 Va. at 341 (citing *Griffin v.*

*Shively*, 227 Va. 317, 321, (1984)).  "Several acts of negligence which separately may not

amount to gross negligence, when combined may have a cumulative effect showing [that gross

negligence exists]." *Chapman v. City of Virginia Beach*, 252 Va. 186, 190 (1996).  However, "a

claim for gross negligence must fail as a matter of law when the evidence shows that the

defendants exercised *some* degree of care." *Elliott v. Carter*, 292 Va. 618, 622 (2016) (emphasis

added).  Of course, any claim for negligence also requires that the individual who was allegedly

negligent possess a duty to the victim to not be negligent. *Amisi v. Riverside Reg'l Jail Auth.*,

469 F. Supp. 3d 545, 572 (E.D. Va. 2020).  Courts routinely determine whether gross negligence

occurred at the summary-judgment stage, despite the inquiry sometimes being a factual one

reserved for the jury. *Cantrell*, 553 F. Supp. 3d at 307–08; *Bethea v. Howser*, 447 F.Supp.3d

497, 517 (E.D. Va. 2020).

As a threshold matter, Defendant clearly owed DeCarlo a duty. While there did not exist a formal relationship between the two, "[t]he only relationship which much exist [for a duty to arise] is a sufficient juxtaposition of the parties in time and space to place the plaintiff in danger from the defendant's acts." *Quisenberry v. Huntington Ingalls Inc.*, 296 Va. 233, 242 (2018). It would be unbelievable for the Court to find, as Defendant urges it to do, that a police officer lacks any duty whatsoever to the members of the community that they are duty-bound to protect. (Def. Mot. at 19.) No court has ever so held, and this Court rejects the invitation to be the first. *See Simpson v. Commonwealth of Virginia*, 2016 WL 3923887, at *9 (E.D. Va. July 21, 2016) ("[C]ourts routinely assess claims for gross negligence arising from the use of force by police officers without clearly identifying a specific duty running from the defendant officers to the plaintiff.").

However, that Defendant has a duty to exercise ordinary care does not imply that his conduct reached the level of gross negligence. While Plaintiff asserts that "Detective List violated all norms of policing (and common sense) when he decided to not utilize cover or de-escalation," she provides no evidence of these norms, nor does she describe how these apparent violations are tantamount to gross negligence. (Pl. Mot. Oppo. at 10.) Indeed, all Defendant must show to avoid liability as to gross negligence is that he exhibited "some degree of care." *Elliott*, 292 Va. at 622.

Here, Defendant showed at least "some degree of care," as he did not "show an utter disregard of prudence amounting to complete neglect of the safety of another." *Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (1987). While he may have shown up at the scene without specifically being asked to do so, there is no indication that this violates any police rule or

23

regulation that could substantiate Plaintiff's claim. And, upon arrival, Defendant made a split-second decision to fire his gun, a decision made only after warning DeCarlo and seeing her turn in his direction with her arm extended, gun in hand. This constitutes the type of "impossible choice that had to be made in the flickering of an instant" that the Fourth Circuit has held rebuts a claim of gross negligence when a police officer kills a citizen. *McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994); *accord Swann v. City of Richmond*, 498 F.Supp.2d 847, 874 (E.D. Va. 2007) (granting summary judgment when officers shot at a victim, because they "acted objectively reasonably and in their own self-defense"). This conclusion is further supported by the Court's analysis *supra*, in Part III.A.2, where it held that the force used by Defendant was reasonable under the circumstances. *Accord Sigman*, 161 F.3d at 789 (when an officer's actions are "reasonable in the circumstances of [the] case, they cannot be negligent or wrongful"). The undisputed facts are such that no reasonable jury could find in Plaintiff's favor, and her claim therefore fails as a matter of law.

## IV.    CONCLUSION

For the reasons stated herein, the Court will GRANT summary judgment in Defendant's favor on all Counts.  He is protected by qualified immunity from Plaintiff's claims brought under 42 U.S.C. § 1983, and Plaintiff's state law claims fail as a matter of law, even when viewing every fact in her favor.  No reasonable jury could conclude otherwise.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Dated:  August 5, 2024